Hood-Wilson v. Board of Trustees, and Ms. Ford, whenever you're ready, we'll hear from you. Thank you. I have a hairline fracture on top of my toes. Oh, take it easy. Several months ago I stumped my toe and I didn't have a picture taken of it and it's still bothering me, so I think I'm suffering from the same thing you are. Your Honor, we're here to discuss the matter that's before you all today, which is whether or not the district court erred in its decision to grant summary judgment to the defendant, Community College of Baltimore. I want to start with the court's statement that the loan affidavit of a Mike Netzer was unrebutted. There was a mountain of evidence in the record that the court simply... Now that he's the college president? No. Dr. Curtinitis is the college president. Mr. Netzer would have been a decision maker in the decision to promote Matthew Bernardi over Melanie Hood-Wilson. He was a hiring manager. He was part of the committee that was... He was a part of the committee, which also goes into one of the abnormalities. Generally speaking, and there's testimony, that CCBC hiring managers are not on a selection committee, especially in the initial phase. They're not even a part of the initial interview. They take part of that process some point down the road. But in this case we had two hiring managers on the selection committee, which is one of the abnormalities that Don Elliott and other witnesses testified to. Because the case really is about preselection and the fact that three men were, and white males, were preselected and the process was structured in a way to make sure that those three males received promotions. We're talking about the workforce development position. There were three assistant dean positions. Let me slow down because I'm talking rather fast this morning. There were three assistant dean positions. One of them was for, it's called workforce solutions, but it's really workforce development. And Matthew Bernardi and Mrs. Hood-Wilson were going head to head on that decision. Why don't you take us just briefly through what you believe was the process. I thought they went through an interview process and they had 14 prescribed questions that they asked. And then the various people graded those interviews. And then they got together and came up with composite scores. Is that all? You can correct it. The process itself on its face seems normal. There was a search committee assembled. Usually there's a search committee and they try to look for people to apply. And the search committee was fairly diversified, wasn't it? In what way? Sex and gender and race. Well, there certainly was one African-American male on the search committee. And there were males and females on the committee too, right? But none of them had program experience. I'm just talking about, it seemed like a, well, go ahead. Let's take a step back. Because, yes, on its face it looks like all things are square. But then for those who have knowledge as to how CCBC works, they understood from the beginning that things were very, very odd. For example, the decision to restructure or reorganize continuing education was exclusively done by Louise Slezak. And she was the one who decided we're going to create three assistant deans. We do have the testimony from Karen Paris that Mr. Netzer was aware of this and said that they wanted to create three positions so that certain people didn't leave the college. And that they needed to pay them more money. Just so, I don't want to slow you down too much, but tell me where, just what the JA I look at for your conclusion that it was not Netzer, but instead Netzer that decided to create these three positions. It's in Louise Slezak's testimony, her deposition testimony. She structured the reorganization, her and Matt Lang. That is, the first page of her deposition testimony is at JA 691. And I have to locate the pinpoint site about her decision to reorganize and create the three positions. But she had the authority herself to do this?  No, the department was her department. She ran that department. And so she, the decision, there was a decision to reorganize, but she was the one that decided or determined. She says that she spoke to Matt Lang, who was her peer, about reorganization. And what that would look like. But they had already spoken with Netzer about it. How is any of this relevant? Well, thank you for asking that question. The initial question or the evidence in the record establishes that the process, even the search committee itself, which I think the first question came from Judge Niemeyer about the interview questions and the process, and isn't this a normal process, and did we have a diverse committee, on their face, yes. But the testimony shows that the decision was already made as to who was going to get the three positions before Mrs. Hudson-Wilson applied. And that because she was more qualified than Mr. Bernardi, they had to rig the process in such a way, or the process was rigged in such a way, to ensure that Matthew Bernardi would get that position, not Mrs. Hudson-Wilson. And this goes to the interview questions. And the selection committee. Don Elliott testified. So who had the final decision authority here for these? Was it the college president? Mike Netzer would be the final decision maker. And he was what? He was the vice president of continuing education, if I'm not mistaken. So he was the direct supervisor of Luis Lizak. Can I just go back? Because when I look at 659, and maybe Judge Agee's right, it doesn't matter, Mr. Netzer says that he's the one that created the three assistant dean positions. And so on reply, I would love for you to tell me what evidence you have that contradicts that statement. He says it very clearly. I created three assistant dean positions to lead each of those units. And so I just want to reply. You gave me the beginning of some testimony. I'm just saying, when you come back up on reply, will you give me whatever it is you want me to look at that contradicts the express statement of Mr. Netzer? Thank you. So back to the search committee. So we have testimony from Mr. Elliott, who also served on search committees prior to this, four dean positions, to be clear, that the search committee was oddly chosen. And number one, hiring managers are not on the committee. That would include Lizak and Netzer. So generally speaking, those aren't on the committee. But if what Ms. Hood-Wilson has pleaded is true, they were on the committee to ensure as well that Bernardi would receive that position. The second thing is the administrative assistant. There could be an admin assistant there to provide administrative support to the search committee. However, we have testimony that it is almost never the case that the administrative assistant of a hiring manager is on the search committee. That would have given Bernardi, out of the five votes. Okay. You're eventually going to get to telling us how any of this relates to the errors you say the district court made. Well, this was evidence in the record that the district court didn't consider. The abnormalities in the process, and I will say the court did come down with a decision, I believe it was in August of this year, the Hollis decision, where the court said, look, deviations from policies and procedures are evidence themselves of circumstantial evidence that could give rise to an inference of discrimination, particularly in hiring decisions. What would be very helpful to us is if you could very specifically tell us, this is what the district court did wrong, and here's where I'm pointing to the record to show you what it did was wrong. So the district court erred in its conclusion that Ms. Hood-Wilson did not have a prima facie case of discrimination. And specifically, the district court did not consider the record evidence of Tanisha Ritten's testimony, Jarena Lloyd's testimony. It passingly cited to Don Elliott and Karen Paris, but we have specific information and evidence from Mrs. Hood-Wilson and these witnesses that, number one, Slesak bore discriminatory animus towards black employees, specifically black female employees. We have evidence from Tanisha Ritten about Slesak's hiring practices and a tendency to promote lesser qualified white employees over more qualified black employees. That is a practice at CCBC. Even outside of Slesak, employees have testified, and it's in the record, that this is something that has happened. Let's just assume that we were to agree with you that there was a prima facie case. Then what? Well, then if there is a prima facie case, then the case has to be remanded back to the district court because of the fact that the court specifically said there is no prima facie case here. But obviously, the next question would go to pretext and whether or not pretext, whether or not Ms. Hood-Wilson had evidence to show that this notion that Bernardi was somehow more qualified was pretextual. And she definitely does. We had more than one employee provide testimony through deposition and affidavits that this process was. If the court was, even if the court erred on the prima facie case, why would it have to go back if there was no error on pretext? Well, there was certainly error on pretext. I know you say that there is. I'm asking the conceptual question. Because you said just before, well, if the district court erred in saying there was no prima facie case, the case is over, it has to go back. So what I'm asking you is if there's a separate finding that we found was correct, that even if there was a prima facie case, there was no pretext, I'm not sure why the case would go back. This is a conceptual question, not necessarily directed to the facts of your case. Well, Your Honor, and let me not overspeak myself, that in the case, in our case, the district court found that there was no prima facie case. And obviously we disagree with that and we know that that's wrong. And I think even on the issue of pretext, though, we know that there's evidence in the record that establishes that the CCBC's explanation is pretextual. Generally speaking, we do have evidence of the difference between Mrs. Hood-Wilson, the way she was treated and her white comparators were treated. We also have evidence of failure to follow internal practices and deviations from policies and practices and direct testimony from employees that it was known that Bernardi was preselected for this position. Can you help me on that point? We seem to have a couple of cases, Anderson from 2005 and Blue from 1990, that both say that preselection is not sufficient to find pretext. So, A, can you help me understand why I should ignore our binding precedent on this point? And then B, why does it make sense to think that preselection is evidence of pretext? I mean, almost every government agency that I have been involved in, there's some degree of preselection that is happening, right? Sort of the people look at the internal candidates and they're like, oh, it's likely to be that person that's going to be the one that gets hired. We're going to go through the process and if it turns out we're wrong, fine, we'll hire somebody else. But there's always sort of some sense of the next supervisor in the U.S. Attorney's Office, we're going to go through the process, but it seems likely it's going to be Sarah over here. I don't understand why pretext is, excuse me, why preselection, as you describe it, is any evidence of pretext or discrimination. Well, it's not that by itself. We want to look at the context here. And I wouldn't say that, I'm not conceding that preselection in and of itself can't provide that evidence. But I do want to look at context, particularly in this case, where we have proof that people have said that Bernardi, and specifically on the areas that Mike Netzer said he was strong, other employees have said actually he's not. We've witnessed him fail to administer. Is that the critical piece? So would we have to find that your client is more qualified than the person chosen in order for preselection to matter? No. You keep saying she's more qualified. I think you understand that we don't do that. Entities get to make their own judgments about who's more qualified, and the fact that your client thinks that she's more qualified doesn't get us anywhere. We should look at the apples. They looked at the oranges. They get to pick. The court is not in the super personnel. You guys are not another personnel committee. But decisions have to be made lawfully. And the case law establishes that. Decisions cannot be made on the basis of discrimination. And so here it's been alleged that it wasn't just, you know, preselection alone. We do have in the record discriminatory comments. We do have hiring practices that often promote lesser qualified white employees over black employees. We also have the fact that Ms. Sleesat was influential over the decision maker in this case. Those observations are so generalized. In other words, you're talking about a workplace that has some people making inappropriate comments. No. Not some people. The decision maker here, Netzer, is the decision maker. And so there has to be he gets a recommendation from the committee who is engaged in a scoring process. And your candidate came out at the bottom of the scoring process. Because the scoring process was created to ensure that she came out at the bottom, judge. Respectfully. And that's what the candidates and other witnesses had attested to. That the questions here weren't geared towards academics or program development or program growth or program enrollment. And those are all the things in the record that a director... That you think the committee should have cared about those things instead of other things. But you just want us to be a super personnel committee. You're like, no, no, no. We really should care about these things, not the things that the committee cared about or that Netzer cared about. I'm not a university administrator. I don't do that. No, but the court should care that decisions are made lawfully in accordance with the law. And I'm running out of time here. What question do you think was discriminatory? Well, again, the questions themselves could appear, again, superficially not discriminatory per se. They appeared to go to particular qualifications for the position that they designed. But they didn't. And there's testimony in the record that the vacancy announcements themselves... You just look at the questions, right? No, judge. The vacancy announcements themselves were actually drafted towards the position descriptions of the preselected individuals to ensure that Mrs. Hudson-Wilson would not get that workforce development position. The questions, the entire process, when we look at the whole process, the totality of that process, was geared to pick a white male over a more qualified black female. And it is the district court still ignored the testimony from witnesses to say that, one, people knew that this was going on at the college. Two, they also knew that Slezak was influential on that committee, because this is really her department. And even in her deposition testimony, she stated that she, the position descriptions, the interview questions, she waffled a little bit on the interview questions. Saying, well, you know, we all created them, but... Why don't you help us out when you come back up and identify a specific question that you say was discriminatory? I don't think that a specific... I'll reply. Okay. Thank you. May it please the court. My name is Vincent Jackson, and I represent the APLE, the Board of Trustees of the Community College of Baltimore County, which I'll refer to simply as CCBC during this argument. This is a straightforward relative qualifications case. The record shows that CCBC used a documented, fair interview process and an objective scoring criteria to select the best qualified candidate to be the Assistant Dean of Workforce Solutions. Nothing in Title VII or Rule 56 requires a court to second-guess that kind of professional judgment. The district court looked at all of the appellant's evidence and drew every reasonable inference in her favor, even then there was no triable fact showing that the college's decision was motivated by race or gender discrimination. This is why the district court properly granted summary judgment, and it is why this court should affirm the district court's decision. Matthew Benardi was the individual who was ultimately selected to be the Assistant Dean of Workforce Solutions, and the record evidence demonstrates that he was by far the best candidate for the Assistant Dean position. So what was most important for this Assistant Dean position? Well, we have that in a record in the job description at Joint Appendix 650. It's managing a large budget. It's managing a large number of people. It's knowing how to deal with millions of dollars of grants. It's having knowledge of WIOA, which is the Workplace Innovation and Opportunity Act. But your colleague on the other side says you're right insofar as it goes, right? The description met your preferred candidate perfectly, but she says that you should have instead cared about other things, and that the only reason that you cared about the things you did was because that was what the white candidate was better at, and that you should have cared more about the things that her client cared about. Help me understand what's your response to that argument. You're just saying, well, he fit the description. I don't take her to really disagree with that, or doesn't significantly disagree with that. What she's suggesting is that you rigged the conditions to favor the white applicant over the black applicant. And I'm curious what your response to that argument is. Yes, Your Honor. I think it's important to note that at the time Vice President Netzer, who was restructuring this department and was figuring out what the assistant dean positions were going to look like, and when he designated these three new assistant dean positions, right, he had no idea who was ultimately going to apply for these positions, right? At that time, he posts the announcement. Ms. Hood-Wilson announces that she's going to apply for that. But no one at the college, there's nothing in the record indicating that anyone at the college had any indication that Ms. Hood-Wilson was going to be applying for those positions. I think there's a fundamental tension that's inherent in the appellant's position, and it's this. It's that the college took every step to ensure that Matthew Bernardi would be the person selected to be assistant dean of workforce solutions. Taylor made this so that it would fit him like a glove in hand. But by the same token, Mr. Bernardi is absolutely unqualified for this position. He has no business holding this position. He couldn't manage grants. He couldn't do this. He couldn't do that. And those two things, they are contradictory. They cannot both be true. And I think that's sort of the cognitive dissonance that underlies much of the appellant's case. That was evident on the record before the district court. And that is one of the reasons why the district court's decision should be affirmed here. So Mr. Bernardi met those qualifications. There is no material dispute of fact that he met those qualifications. Judging by his resume, judging by the fact that when he was director of connections to employment prior to becoming the assistant dean, he had to manage a large number of people, 28 full-time employees, 17 part-time employees, and 110 adjunct faculty. That was comparable to the roughly 60 full-time employees, 30 to 50 part-time employees, and 110 adjunct faculty that he actually managed as assistant dean. So that was very important for the position, and it was something that Mr. Bernardi was ably qualified as. Now, this case is unique in that, as the court is aware, at Joint Appendix 669 through 671, we actually have a scoring matrix that gives us insight into the selection committee, how they're grading each individual applicant based upon the scores for the 14 questions that were designed for this application process. So we have insight not only into how the selection committee as a whole is viewing this, but how each individual member of the selection committee is grading each applicant. So we've got a finely grained scoring matrix. Go back and remind me, who selected the questions? The questions were part of the, the committee met, they helped come up with the questions, and they eventually settled on the 14 questions. So it was a committee decision as to the wording of the questions? Yes, Your Honor. And in arriving at these questions and in going through this impartial process that is meant to ensure fairness, Mr. Bernardi, at the conclusion of it, he scored 285 out of a possible 350 points. The appellant scored 181, over 100 points lower than Mr. Bernardi. This simply reiterates that Mr. Bernardi was far more qualified. Interestingly, interestingly, Louise Slazak, who was the appellant's direct supervisor and who was the assistant dean and who served on the committee, she's been portrayed as the villain, right, who sought to torpedo appellant's chances of getting this job. Well, Ms. Slazak, you can see from the record, Joint Appendix 669, she gives appellant one of her highest scores among the individual members. She gives her a 38. The only person who gives appellant a higher score is Vice President Netzer, who gives her a 39. This is in contrast to the score given by Mr. Ken Buck, the African American male who sat on the committee who gave appellant a score of a 35. Mr. Buck, as it happens, was deposed in this case and upon being asked if he believed that race or gender played any role in this promotion decision, his answer unequivocally was no. That's in the Joint Appendix at 1078 and 1079. Now, it's telling, I think, that appellant failed to depose Mike Netzer. That's certainly unusual in a failure to promote case where we have a decision maker who's identified in CCBC's answers to interrogatories and we thank the panel for permitting us to supplement the appendix with our answers to interrogatories to reflect that fact because it was not raised for the first time until this appeal. So Netzer was the one who made the final decision? Absolutely, Your Honor, yes. That was all on Netzer. Netzer was not deposed. The appellant had the ability to depose anyone in CCBC leadership. She could have deposed the President. She could have deposed the Vice President who oversees Human Resources. She could have deposed the Director of Human Resources herself. She could have deposed the other two members of the Selection Committee who we never heard testimony from her. She could have taken even the 30B6 deposition of CCBC, but she declined to do any of that. Instead, she relied on evidence from Don Elliott, who was actually a co-applicant for the same position, the Assistant Dean of Workforce Solutions. And judging by the scoring matrix on Joint Appendix 669, if Mr. Bernardi hadn't applied for this position, it may well have been Mr. Elliott who would have gotten the position based upon his scores. What's your response to your colleague's suggestion that there are all these procedural irregularities with this process? That they put people on, she gives a couple of different examples, administrative assistants, department folks, that were not permissible members of the hiring committee. What's your response to that? Our response, Judge Richardson, is that there were no procedural irregularities whatsoever. The only evidence that appellant adduced of procedural irregularities was taken primarily from the deposition of Don Elliott. As I was saying, Don Elliott was one of the applicants to this position, so he was certainly not in a position at all to judge the... So your response, in part, is that she has not shown that there were any irregularities under the regulations of the college at the time. Exactly. If there had been, for example, a rule that said whatever it might have said, and they violated that rule, that might be a procedural irregularity that's relevant. But an irregularity that is based on this is not the way things have normally been done is not an irregularity. That is correct, Your Honor, and particularly when that testimony that this is not the way things have been done, it doesn't come from anybody in college leadership. It doesn't come from anybody on a selection committee. It comes from employees, right? And in some cases, low-level employees, not to diminish them, but part-time adjunct instructors who have no direct personal knowledge of anything that goes on in the selection committee and are relying on pure speculation to get to that point. And these are the two affidavits that my colleague referenced that the district court did consider, did give credence to, and still found that there was no material dispute of fact. Now, under these circumstances, the appellant, and I know there's been some talk in this circuit and with Justice Thomas' concurrence in the Ames decision this past February about McDonnell-Douglas and the continuing relevance of that shifting burdens of proof and that whole framework. And I think what's unique about this case is that whether McDonnell-Douglas, whether that analysis applied, whether we just did a straight Rule 56 analysis, you know, is there any dispute of material fact sufficient to send this case to a jury, the answer in both instances is no. It doesn't matter which evidentiary framework you use at summary judgment. So the district court correctly held that the appellant failed to establish a prima facie case. This was on the floor. So what happens if we just assume for purposes of argument thought there probably was enough to say there was a prima facie case pled, but that wouldn't end the case? That would what would still happen, even if there was a prima facie case pled, the district court was anticipating this and did a thorough analysis and said, well, look, even if a prima facie case was pled, she still went on to analyze the legitimate non-discriminatory reason that CCBC proffered in response to the prima facie case, and then she analyzed whether the appellant could establish pretext. That, in your view, was sufficient at this stage for you to prevail? Yes. So we would submit that even if this court were to decide that the district court erred in holding that there was not a prima facie case, we would still go through the remaining two steps of McDonnell-Douglas, and the district court properly analyzed those as well, and it would still be grounds for affirming the district court because this was a straightforward relative qualifications case. As this appellant concedes, no court sits as a super-personnel department, and there has not been a shred of any evidence in this record that ties any racial or gender-based discriminatory animus to the selection process or to Vice President Mike Netzer, who was tasked with making the final decision, and who could have rejected the decision of the committee, but did not. So even crediting every inference in the appellant's favor, like I said, nothing in this record ties race or gender to the college's decision. The district court did exactly what Rule 56 requires. It accepted the appellant's version of events, viewed every inference in her favor, and still found no evidence that race or gender played any role. This is not a failure of the district court to see the facts. It is actually a recognition that the facts, even taken as true, do not show any unlawful motive here. Title VII requires proof that bias actually caused the challenge in employment action, the failure to promote here. We don't have any proof of that. When a public institution follows a fair process and the record shows that there is no discriminatory cause, summary judgment is not merely warranted. It is justice that is consistent with Title VII itself. For these reasons, we would ask that the judgment of the district court be affirmed, and unless the panel has any more questions, I would serve on that. Thank you, Mr. Jackson. Thank you, Your Honor. Ms. Ford? To start off with by answering Judge Richardson's question about the creation of the structure, on page JA-931, that is Sleazack's testimony. She actually testified that she didn't know who made the decision to create the three positions, but then I asked, I should say internally first, was the decision made by all of you to say this is the route we're going to go? And she said, yes, I believe so. Everybody was in agreement, rather than keeping it the way it was, that we take advantage of the vacancy, that was of Kent Smedley, and focus our efforts on having three different divisions. So when you said that she did it and not Netzer, that's not true? I was incorrect by saying that it was she, but it was their decision to go, to create the three positions, and then he adopted that. So your position is that when Netzer says directly, I did it, that that is contradicted by testimony where she says, I don't know who created the position. No, Your Honor, I think I misspoke there. I think the decision, she decided how it would be structured, i.e., Assistant Dean of Workforce Solutions, and Assistant Dean of Allied Business and Health. She was involved in that detail. But the decision to create or adopt three assistant deans, versus having to replace Kent Smedley's position, that had to be, that decision had to be made by the Vice President. But she was the one that designed the structure. It's in her testimony. Where's that? So again, at page 931, and it goes on for time. Is there anywhere other than 931? Because 931, I don't believe, says that. And so I'm just trying to understand, is there anywhere else that we should look at where it says that she's the one that designed the structure? Well, Your Honor, I believe, if I'm looking at line 11, yes, I believe so. Everybody was in agreement that we would do, rather than keeping it the way it was, we'd take advantage of the vacancy and focus our efforts on having three different divisions. Then she goes on to say, and I ask, were there only two of you on? At some point the decision was made to create the three positions. Who made that decision? I honestly don't know. I would imagine the President. Well, and that's what I corrected myself with Judge Richardson when I said that, I think the question was, who created the positions? And Netzer's affidavit, he said, it was Netzer. I said it was Slezak, but I needed to correct myself to say that. Her testimony said she didn't know. But there's nothing there that talks about the selection structure. I'm sorry. This is just the notion. She chimed in to the three positions that somebody else created, which she assumed was the President. Correct. That's all she testifies. I'm looking at 931. Yeah, that's what she's talking about here. And then she goes on to talk about the different backgrounds and what each assistant dean position would do. But that doesn't refute the testimony. Tell me where I'm supposed to be looking. It says that she chose those things. That she's the one that created the structure. She goes on and she does this, but give me where I'm supposed to read, because I have some doubts about whether what you're telling me is actually in the record. Okay, so on the next page, Your Honor, Judge Richardson, she's discussing the programming and what went into the programming and how the programming was delineated. And I don't want to use up all my time on that, because I have to get to some other issues. And I'm happy to stay where you want me. You're welcome to take your time wherever you'd like. I just want to make sure I'm hitting some of the issues or the questions that were also asked by some of the other judges as well. I think the focus is on whether or not there's a triable issue here in this court. And Judge Richardson, I believe it was you who brought up Anderson and the notion that the court is in second-guessing decisions. But as long as those decisions are lawful and made on a lawful basis. And the court addressed this squarely in Hollis by saying, look, even pretext, if we look at that, that there is evidence. And the court pretty much, and it's the same judge, used the same language in Hollis that she used here, saying that the record was undisputed. But the court said, listen, when we do see deviations from process, and I think, Judge Richardson, you asked the appellee whether or not there's a policy deviation. But in Hollis, I believe the court made it clear that even if it's practice or certain procedures that the college is accustomed to using, that deviations themselves can be inferences or give rise to an inference of discrimination sufficient for a jury question. And that's what we saw here. And that's what the testimony in the record shows that it wasn't just the composition of the search committee, but even the interview questions, which we have testimony from witnesses to say that this, literally Don Elliott said he would look at a question and say, okay, that's the Matt Bernardi question. That's the Steve Judge question. That's not discrimination. That's just identifying, there may have been an identification that Bernardi was well suited for the job because he had managed big programs and a lot of people. But taken together with the discriminatory comments, too, that we have in the record made by Ms. Lezak about, not just Ms. Hood-Wilson, but specifically to Ms. Hood-Wilson. So what do you say to the response that she gave your client one of her best scores? I don't think that matters when the process was designed from the outset to make sure that Bernardi, and we were talking about the workforce solutions position, that Bernardi was the one selected and that she wasn't based on gender and race. Your information to us is page 932 is where you think she says that she designed that process. No, no, the question was different. I understood your question to be about who created the three vacancies. That's what I understood your question to be. So if I misunderstood it, Judge, I'm sorry. We've gone through the red light and we've given you a little latitude there. Thank you. I appreciate the latitude that was given. We'll come down Greek Council and take a short recess.
judges: Paul V. Niemeyer, G. Steven Agee, Julius N. Richardson